# In the United States Court of Federal Claims

No. 20-2038C
Filed: July 23, 2021
FOR PUBLICATION

| |
|---|
| **INDIANA MUNICIPAL POWER AGENCY, et al.,** |
| *Plaintiffs*, |
| v. |
| **UNITED STATES,** |
| *Defendant*. |

*Peggy A. Whipple*, Healy Law Offices, LLC, Springfield, MO, for the plaintiffs.

*Rebecca S. Kruser*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

### HERTLING, Judge

The plaintiffs are public-sector power providers. The plaintiffs all issued Direct Payment Build America Bonds ("BABs"), authorized by section 1531 of the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub. L. No. 111-5, 123 Stat. 115 (2009). Under the ARRA, issuers of Direct Payment BABs are entitled to a refund from the Internal Revenue Service ("IRS") of 35 percent of the interest payable under the BABs.

The defendant, the United States acting through the Treasury Department and the IRS, stopped making payments to the plaintiffs based on the ARRA's 35-percent rate in 2013. The plaintiffs argue that, since 2013, the defendant has been violating its statutory obligation to pay 35 percent of the interest payable under their Direct Payment BABs. The plaintiffs also allege that section 1531 created a contractual agreement with the defendant, and the defendant's failure to pay at the 35-percent rate has breached that contract.

The defendant has moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").

Legislation enacted by Congress after the issuance of the Direct Payment BABs under the ARRA required sequestration of direct spending. "Direct spending" does not include budget authority provided by "appropriation Acts." *See* 2 U.S.C. § 900(c)(8)(A). If the tax refunds for Direct Payment BABs are direct spending, sequestration has the effect of reducing the amount

payable by the IRS to bond issuers. The plaintiffs' statutory claims turn on whether interest payments for Direct Payment BABs are direct spending or reflect spending under an "appropriation Act."

The Court finds that the payments are direct spending. The subsequent legislation, therefore, modified the defendant's payment obligations, reducing the amount that the defendant is statutorily required to pay the plaintiffs.

The plaintiffs' contract claims also fail. The presumption is that a statute does not create contract rights. For a statute to obligate the government contractually, the statute must speak in contractual terms. Section 1531 of the ARRA does not include any such language. Thus, the plaintiffs have not pleaded facts sufficient to establish the defendant's intent to contract through the statute.

The plaintiffs therefore cannot recover on either their statutory or contract claims. Their complaint fails to state a claim upon which relief can be granted. The Court grants the defendant's motion to dismiss.

## I.     BACKGROUND[1]

### A.     Build America Bonds

#### 1.     Statutory Authority

Following the 2008 financial crisis, the ARRA sought to promote economic recovery through, among other means, investment in infrastructure and stabilization of state and local government budgets. ARRA § 3(a), 123 Stat. 115, 115-16 (listing the purposes of the ARRA). Section 1531 authorized refundable credit or tax credits to state and local governments that issue BABs, which were subsidized to lower the cost of borrowing for state and local governments. *Id.* § 1531, 123 Stat. 115, 358-60.[2] The BABs at issue here, Direct Payment BABs, were to be used for capital expenditures. *Id.*

The provisions relevant to BABs were codified at 26 U.S.C. §§ 54AA and 6431. Although those sections were removed from the Code in 2017, Congress limited the amendment

---

[1] In considering the defendant's motion to dismiss, the Court assumes the facts alleged in the plaintiffs' amended complaint to be true. (ECF 13.) This summary of the facts does not constitute findings of fact but is simply a recitation of the plaintiffs' allegations.

[2] A "tax credit" is "[a]n amount that offsets or reduces tax liability." Government Accountability Office, *A Glossary of Terms Used in the Federal Budget Process* 94 (Sept. 2005) ("GAO Glossary"), *available at* https://www.gao.gov/assets/gao-05-734sp.pdf. A tax credit is considered refundable "[w]hen the allowable tax credit amount exceeds the tax lability and the difference is paid to the taxpayer . . . ." *Id.*

removing the provisions to "apply [only] to bonds issued after December 31, 2017."[3]  Budget Fiscal Year 2018, Pub. L. No. 115-97, § 13404(a), (b) & (d), 131 Stat. 2054, 2138 (2017).  The citations that follow are to those provisions as they appeared prior to their repeal.

Section 54AA(g) of Title 26 authorized issuers of Direct Payment BABs to receive a refundable credit in lieu of tax credits under section 6431 of the same title.  26 U.S.C. § 54AA(g).  Section 6431 provided the payment scheme: "In the case of a qualified bond issued before January 1, 2011, the issuer of such bond shall be allowed a credit with respect to each interest payment under such bond which shall be payable by the Secretary," who "shall pay (contemporaneously with each interest payment date under such bond) to the issuer of such bond (or to any person who makes such interest payments on behalf of the issuer) 35 percent of the interest payable under such bond on such date."  *Id.* § 6431(a)-(b).

The Treasury Department pays issuers of BABs annually upon receiving a timely Form 8038–CP (Return for Credit Payments to Issuers of Qualified Bonds) filed by the issuers.  IRS Notice 2009-26, § 3.1.  The "payments are treated as overpayments of tax."  *Id.* § 3.3.  As a refundable tax credit, the payments for the Direct Payment BABs are funded by the permanent, indefinite appropriation for refund of internal revenue collections.  *See* 31 U.S.C. § 1324 (providing for the appropriation of "[n]ecessary amounts . . . for refunding internal revenue collections," including refunds due under 26 U.S.C. § 6431).

### 2. Plaintiffs' Bonds

The plaintiffs are the following public power entities: Indiana Municipal Power Agency; Missouri Joint Municipal Electric Utility Commission; Northern Illinois Municipal Power Agency; American Municipal Power, Inc.; Illinois Municipal Electric Agency; and Kentucky Municipal Power Agency.  (ECF 13, ¶¶ 3-8.)  All the plaintiffs issued Direct Payment BABs to fund capital investments in projects that provide electric power to more than 300 municipalities in nine states.  (*Id.* ¶ 31.)

The plaintiffs collectively issued $4,097,680,000 in Direct Payment BABs before January 1, 2011—within the timeframe for bonds to qualify under 26 U.S.C. § 6431 and before the 2017 cutoff created by Congress when it repealed § 6431.  (*Id.* ¶¶ 30, 32.)  The plaintiffs allege that their Direct Payment BABs comply with the requirements established by section 1531 of the ARRA.  (*Id.* ¶¶ 32-34.)  Indeed, the defendant paid the full 35 percent of the bonds' interest payments from January 2010 through the end of 2012.  (*Id.* ¶ 36.)

---

[3] For the bonds to qualify for the program, the bonds had to be issued before January 1, 2011. *See* 26 U.S.C. §§ 54AA(d)(1)(B), 6431(a).  As a result, any bonds issued after December 31, 2017, would not qualify for the program, regardless of the 2017 amendments.  The discrepancy between these dates makes no difference to the resolution of this case.

### B. Sequestration

Congress reinstated and amended the Budget and Emergency Deficit Control Act of 1985, Pub. L. No. 99-177, 99 Stat. 1037 (1985) (codified at 2 U.S.C. § 900 et seq.), through the Budget Control Act of 2011 ("Budget Control Act"), Pub. L. No. 112-25, 125 Stat. 240 (2011). The Budget Control Act requires automatic reductions of certain government spending through sequestration, which "refer[s] to or mean[s] the cancellation of budgetary resources provided by discretionary appropriations or direct spending law." 2 U.S.C. §§ 900(c)(2), 901a.

The term "budgetary resources" refers to "new budget authority, unobligated balances, direct spending authority, and obligation limitations." *Id.* § 900(c)(6). "Direct spending," in turn, refers to "budget authority provided by law other than appropriation Acts"; "entitlement authority"; and "the Supplemental Nutrition Assistance Program." *Id.* § 900(c)(8). Except for one exception not relevant here, sequestered budgetary resources are permanently cancelled. *Id.* § 906(k)(1).

The Budget Control Act requires reductions in discretionary appropriations and direct spending accounts in accordance with 2 U.S.C. § 901a, which directs the Office of Management and Budget ("OMB") to determine the amount of funds to be sequestered and the President to order sequestration. *Id.* § 901a. The only programs exempt from sequestration are listed in 2 U.S.C. § 905. Although "[p]ayments to individuals made pursuant to provisions of Title 26 establishing refundable tax credits" are exempt from reduction, payments to entities, such as the plaintiffs, are not exempt. *Id.* § 905(d). The lists of programs that are exempted likewise do not include the Direct Payment BABs payment program. *See id.* § 905.

At the beginning of 2013, the American Taxpayer Relief Act of 2012 ("Taxpayer Relief Act"), Pub. L. No. 112-240, 126 Stat. 2313 (2013), amended the statutes created by the Balanced Budget and Emergency Deficit Control Act of 1985. The Taxpayer Relief Act provided that "[n]otwithstanding any other provision of law, the fiscal year 2013 spending reductions required by . . . the Balanced Budget and Emergency Deficit Control Act of 1985 shall be evaluated and implemented on March 27, 2013." Taxpayer Relief Act § 901(b), 126 Stat. 2313, 2370.

Under the sequestration required by the Taxpayer Relief Act, in 2013 the defendant stopped making payments to issuers of Direct Payment BABs at the rate of 35 percent of the bonds' interest as provided under the ARRA. (*See* ECF 13, ¶ 37.) Although the BABs program remains in effect for bonds issued before January 1, 2018, the defendant has been paying issuers of BABs at rates reduced by the amount of funds determined by OMB to be covered by sequestration. (ECF 15 at 8-9.) In 2013, for example, payments were reduced from 35 percent

to 8.7 percent, the fiscal year 2013 sequestration rate.[4]  Sequestration has been extended through 2030.[5]

### C. Procedural History

On December 30, 2020, the plaintiffs filed their complaint (ECF 1), which was later amended (ECF 13).  The amended complaint seeks damages for the defendant's failure to make direct cash payments to the plaintiffs equal to 35 percent of each interest payment made by the plaintiffs for their Direct Payment BABs.  (*See id.*, Prayer for Relief.)  Counts I, III, and V allege that the defendant has violated (and continues to violate) section 1531 of the ARRA.  (*Id.* ¶¶ 41-50, 57-66, 73-82.)  Counts II, IV, and VI allege that the defendant has breached its contractual obligations created by section 1531.  (*Id.* ¶¶ 51-56, 67-72, 83-88.)

The defendant moved to dismiss (ECF 15), and the matter was fully briefed.  The Court heard oral argument on June 22, 2021.  Following oral argument, the Court allowed the plaintiffs to submit a sur-reply, which was filed on July 9, 2021.

## II. JURISDICTION[6]

The Tucker Act, 28 U.S.C. § 1491(a), gives this court limited jurisdiction over claims for damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded

---

[4] The degree to which sequestration reduces the percentage of interest the government pays varies each year.  The following link provides the yearly sequestration rate reductions from 2013 through the present: https://www.irs.gov/tax-exempt-bonds/effect-of-sequestration-on-state-local-government-filers-of-form-8038-cp.

[5] Sequestration was extended through fiscal year 2023 by the Bipartisan Budget Act of 2013, Pub. L. No. 113-67, § 101, 127 Stat. 1165 (2013); through fiscal year 2024 by the Extension of Direct Spending Reduction for Fiscal Year 2024, Pub. L. No. 113-82, § 1, 128 Stat. 1009 (2014); through fiscal year 2025 by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 101, 129 Stat. 584 (2015); through fiscal year 2027 by the Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 30101, 132 Stat. 64 (2018); through fiscal year 2029 by the Bipartisan Budget Act of 2019, Pub. L. No. 116-37, § 402, 133 Stat. 1049 (2019); and through fiscal year 2030 by the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 3709, 134 Stat. 281 (2020).

[6] The defendant argues that the Court has no jurisdiction to consider the plaintiffs' claims for damages beyond six years of filing this case.  *See* 28 U.S.C. § 2501.  The effect on the damages available to the plaintiffs of a dismissal based on the statute of limitations would not be known until after discovery because there is not yet a sufficient factual record to identify which damages

> either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  The Tucker Act itself does not "create[ ] a substantive right enforceable against the Government by a claim for money damages."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003).  Instead, the Tucker Act limits this court's jurisdiction to causes of action based on separate money-mandating statutes and regulations.  *Metz v. United States*, 466 F.3d 991, 995-98 (Fed. Cir. 2006).

The defendant does not challenge this court's jurisdiction over Counts I, III, and V of the plaintiffs' amended complaint.  Because section 1531 creates a payment obligation on the government, the Court finds that section 1531 is money-mandating and, therefore, that the Court has jurisdiction over the plaintiffs' Counts I, III, and V.  *See LCM Energy Sols. v. United States*, 128 Fed. Cl. 728, 729 (2016) (finding a similar provision of the ARRA to be money-mandating).

Although the defendant initially challenged this court's jurisdiction over the plaintiffs' contract claims in its opening brief (ECF 15 at 20), the defendant admitted at oral argument that the plaintiffs may have asserted nonfrivolous allegations of a contract with the United States, as required to establish jurisdiction over their contract claims (ECF 22, Oral Arg. Tr. at 23:16-24:8).  As a result, the defendant conceded that its motion would be more appropriately analyzed as a motion to dismiss for failure to state a claim upon which relief can be granted.

The Court agrees.  The plaintiffs have asserted a nonfrivolous claim of a contract with the United States and, accordingly, the Court has jurisdiction over the plaintiffs' contract claims in Counts II, IV, and VI.  *See* 28 U.S.C. § 1491(a)(1) (providing jurisdiction over claims founded on express or implied contracts with the United States); *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) ("[J]urisdiction under [28 U.S.C. § 1491(a)(1)] requires no more than a non-frivolous *allegation* of a contract with the government." (emphasis in original)).

### III.   STANDARD OF REVIEW

The defendant has moved to dismiss the plaintiffs' complaint for failure to state a claim under RCFC 12(b)(6).  Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  A court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party.  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).  To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiffs are entitled to

---

would be barred.  Dismissing the amended complaint for failure to state a claim, the Court does not consider the defendant's argument on the statute of limitations.

the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

## IV.   DISCUSSION

The defendant argues that both the plaintiffs' statutory claims and their contract claims must be dismissed for failure to state a claim. First, the defendant argues that the statutory scheme to pay Direct Payment BABs is funded through direct spending, not an "appropriation Act." As direct spending, the payment scheme was altered by subsequent legislation, which sequestered that spending. Second, the defendant argues that the plaintiffs have not pleaded the requisite elements to establish a contract with the government. Namely, the plaintiffs cannot show that the government intended to contract through the statute authorizing Direct Payment BABs. The Court considers both arguments in turn.

### 1.   Statutory Payment Obligation

The plaintiffs issued Direct Payment BABs in accordance with section 1531 of the ARRA. That section authorized issuers of qualifying Direct Payment BABs to receive refundable tax credit. ARRA § 1531, 123 Stat. 115, 358-60. The defendant does not dispute that the added provisions obligate the government to pay. (ECF 15 at 16.) Notably, section 6431(a) of Title 26, added by the ARRA, provided that "the issuer of such bond *shall be allowed* a credit with respect to each interest payment under such bond which *shall be payable* by the Secretary," and subsection (b) of the same section provided that "[t]he Secretary *shall pay* (contemporaneously with each interest payment date under such bond) to the issuer of such bond . . . 35 percent of the interest payable under such bond on such date." 26 U.S.C. § 6431(a)-(b) (emphasis added).

The ARRA also amended 31 U.S.C. § 1324 to provide funding for refunds due under 26 U.S.C. § 6431. ARRA § 1531, 123 Stat. 115, 360; *see also* 31 U.S.C. § 1324(b)(2) (providing explicitly for refunds from 26 U.S.C. § 6431). Section 1324 of Title 31 provides for "[n]ecessary amounts" to be appropriated "for refunding internal revenue collections as provided by law." 31 U.S.C. § 1324(a). The parties do not dispute whether § 1324 establishes an indefinite, permanent appropriation. It does. *See* Government Accountability Office ("GAO"), *Principles of Federal Appropriations Law* 2-23 (4th ed. 2016), *available at* https://www.gao.gov/assets/2019-11/675709.pdf (listing 31 U.S.C. § 1324 as a statute that makes an appropriation); *see also id.* at 2-10 ("[A] 'permanent indefinite' appropriation is open ended as to both period of availability and amount.").

Sequestration, as implemented by the Budget Control Act and the Taxpayer Relief Act, has the effect of permanently cancelling certain budgetary resources, which includes direct spending authority. 2 U.S.C. §§ 900(c)(6), 906(k)(1). The term "direct spending," as relevant here, means "budget authority provided by law *other than appropriation Acts* . . . ." *Id.* § 900(c)(8) (emphasis added). The payment program for Direct Payment BABs is not listed as a program or activity exempted from sequestration. *See id.* § 905.

Thus, the crucial issue is whether 31 U.S.C. § 1324, the funding mechanism for paying issuers of Direct Payment BABs, authorizes direct spending, or whether it is an "appropriation Act." If the provision authorizes direct spending, it is subject to sequestration, and the plaintiffs would be unable to prevail on their statutory claims.

### 2. Appropriation Act

The United States Constitution commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7. As the D.C. Circuit has noted, "[t]his clause is not self-defining and Congress has plenary power to give meaning to the provision." *Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977). Appropriating funds to operate the government is a core function of Congress, and "[t]he Congressionally chosen method of implementing the requirements of Article I, section 9, clause 7 is to be found in various statutory provisions." *Id.* at 194-95. In exercising this constitutional function, Congress uses the term "appropriation Act" in a specific, technical sense. *Principles of Federal Appropriations Law*, at 2-17 to 2-21 (explaining the legislative process for considering and enacting appropriation acts).

To govern this special type of legislation, both houses of Congress have adopted special rules for the consideration of appropriation bills distinct from the rules governing the consideration of general legislation. For example, both houses of Congress have similar rules limiting appropriations in appropriation bills to expenditures already authorized by existing law. *See* H.R. Doc. No. 116-177, House Rule XXI, 2(a)(1) (2019); S. Doc. No. 113-18, Senate Rule XVI, 1. (2013).[7] Both houses also prohibit the inclusion of general legislation in appropriation bills. *See* House Rule XXI, 2(b); Senate Rule XVI, 2. The latter limitation is a crucial one and helps to identify with specificity whether a bill is or is not appropriation legislation that, once enacted, becomes an "appropriation Act." These rules of each chamber applying special requirements to appropriations bills were also in effect in 1990 when Congress enacted the definition of "direct spending," which excludes budget authority provided by "appropriation Acts." *See* 2 U.S.C. § 900(c)(8); S. Doc. 101-1, Senate Rule XVI (1989); H.R. Doc. No. 100-248, House Rule XXI (1988).

The term "appropriation Act" in Title 2 of the United States Code reflects a similar technical meaning defined, as noted below, elsewhere in the federal law, and, as a result, also reflects a term of art. *See Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) ("'[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in

---

[7] The current House Rules are available at https://rules.house.gov/sites/democrats.rules.house.gov/files/documents/116-House-Rules-Clerk.pdf. The current Senate Rules are available at https://www.rules.senate.gov/download/the-rules-of-the-senate.

the body of learning from which it is taken.'" (quoting *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012)) (modifications in original)).

The plaintiffs contend that 31 U.S.C. § 1324 is an "appropriation Act" because it permanently appropriates funds for refunding internal revenue collections. The Court disagrees. Appropriation acts are not, as the plaintiffs' argument suggests, all statutes referring to the appropriation of funds. Two sources provide relevant definitions of "appropriation Act": another statute in Title 2 and the GAO Glossary.

First, in the sections of Title 2 of the United States Code governing congressional budget and fiscal operations, Congress has defined the term "appropriation Act" to mean "an Act referred to in section 105 of Title 1." 2 U.S.C. § 622(5). Section 105 of Title 1 of the U.S. Code, cross-referenced in 2 U.S.C. § 622(5), provides the following: "The style and title of all Acts making appropriations for the support of Government shall be as follows: 'An Act making appropriations (here insert the object) for the year ending September 30 (here insert the calendar year).'" 1 U.S.C. § 105. The term "appropriation Act" from the definition of "direct spending" in 2 U.S.C. § 900(c)(8) should be read *in pari materia* and given the same meaning as it has in § 622(5) of the same Title. *See United States v. Davis*, 139 S. Ct. 2319, 2329 (2019) ("[Courts] normally presume that the same language in related statutes carries a consistent meaning.").

Second, the GAO Glossary defines the term "Appropriation Act" as "[a] statute, under the jurisdiction of the House and Senate Committees on Appropriations, that generally provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes." GAO Glossary 13. The GAO's definition carries persuasive weight in the budget context because the GAO has a statutory mandate to "establish, maintain, and publish standard terms and classifications for fiscal, budget, and program information" in cooperation with the Secretary of the Treasury, the Director of the OMB, and the Director of the Congressional Budget Office ("CBO"). *See* 31 U.S.C. § 1112(c)(1). The Supreme Court has relied on the GAO Glossary in interpreting federal law. *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319, 1322 (2020).

Section 1324 is not an "appropriation Act" under either definition. Section 1324 of Title 31 does not fall within the definition of "appropriation Act" found in Title 2. The Act in which Congress enacted section 1324 did not use the style and title specified in 1 U.S.C. § 105 and did not make appropriations for a specific calendar year. *See* Pub. L. No. 97-258, 96 Stat. 877 (1982) (creating section 1324 as part of "[a]n Act to revise, codify, and enact without substantive change certain general and permanent laws, related to money and finance, as title 31, United States Code, 'Money and Finance'").

At oral argument, the plaintiffs argued that section 1324 is an "appropriation Act," and the special title required by 1 U.S.C. § 105 "applies only to 'appropriations for the support of Government.'" (ECF 22, Oral Arg. Tr. at 27:1-22 (quoting 1 U.S.C. § 105).) They argued that "the payments at issue here are not appropriations for the support of government, they are the Government's promised share of the interest payments that are due for the life of the BABs bonds . . . ." (*Id.* at 27:12-15.) This "support of Government" language, however, is itself a term of art. The same phrase is mirrored in the Senate Rule XXV(b) summarizing the legislative

9

jurisdiction of the Senate Appropriations Committee. *See* Senate Rule XXV(b). As a term of art, the phrase "for the support of Government" is not restricted to the appropriation of funds for the operations of government agencies; if it were so limited, the word "agencies" would follow "government" in the phrase. Instead, the phrase reflects that it applies to all bills appropriating any money "in support of Government" *policies*, which is necessary under the Constitution if any federal funds are to be expended from the Treasury. That phrase, therefore, does not limit the application of § 105 to appropriations for the operation of federal agencies.

The Act creating section 1324 also did not fall under the legislative jurisdiction of the House or Senate Committees on Appropriations, as provided in the GAO Glossary definition, but rather was referred to the Judiciary Committees of both houses of Congress. The Act was not considered under the rules of either chamber governing floor consideration of appropriation bills. *See* 128 Cong. Rec. H19932-H20003 (Aug. 9, 1982) (House floor consideration), S22597 (Aug. 20, 1982) (Senate passage without amendment by unanimous consent). Accordingly, although the Act contains multiple authorizing provisions and provides for the appropriation of funds to pay tax refunds, it is not an "appropriation Act" in the technical sense.

If section 1324 is not an appropriation Act, what is it? It does provide on its face for spending to cover permanent expenditures for the payment of tax refunds, but that feature, standing alone, does not convert the provision into an appropriation Act. By authorizing such permanent spending, section 1324 is most naturally seen as providing for direct spending. As "budget authority provided by law other than appropriation Acts," section 1324 is direct spending for the purposes of sequestration. *See* 2 U.S.C. § 900(c)(8).

This conclusion is consistent with the GAO Glossary's definition of "direct spending." The GAO explains that "[d]irect spending may be temporary or permanent, definite or indefinite (as to amount) but *it is an appropriation* or other budget authority *made available to agencies in an act other than an appropriation act*." *See* GAO Glossary 45 (emphasis added); *see also id.* at 21 ("An appropriation act is the most common means of providing appropriations, however, authorizing and other legislation itself may provide appropriations."). Accordingly, and contrary to the plaintiffs' argument, a statute may provide permanent, indefinite appropriation authority, as does section 1324, without being an "appropriation Act."[8]

---

[8] In their sur-reply, the plaintiffs allege that "[t]he Judgment Fund is similarly funded by a permanent appropriations act." (ECF 23 at 6 n.15.) They are correct that the Judgment Fund, like 31 U.S.C. § 1324, is an indefinite, permanent appropriation. Unlike tax refunds to entities under § 1324, however, the category of "Claims, Judgments, and Relief Acts" is expressly exempted from sequestration. *See* 2 U.S.C. § 905(g)(1)(A). Congress would have no reason to enact that exemption if the Judgment Fund were already exempt from sequestration as an "appropriation Act." The plaintiffs' citation to the Judgment Fund undercuts rather than supports their argument.

To emphasize the point that a statute can provide an appropriation without being an appropriation act, the GAO provides an example from a law enacted to settle land claims by the Coushatta Tribe against the United States:

> The Secretary of the Treasury is authorized and directed to pay to the Secretary of the Interior . . . for the benefit of the Coushatta Tribe of Louisiana . . . out of any money in the Treasury not otherwise appropriated, the sum of $1,300,000.

*Principles of Federal Appropriations Law*, at 2-56 (quoting Pub. L. No. 100-411, § 1(a)(1), 102 Stat. 1097 (1988)) (modifications added by the GAO). The GAO explains that "it is certainly an appropriation—it contains a specific direction to pay and designates the funds to be used—but, in a technical sense, it is not an appropriation act." *Id.* The GAO also notes that the cited provision "contains its own authorization" but does not fit the description of an authorization act. *Id.* As a result, the GAO concludes that "we have an authorization and an appropriation combined in a statute that is neither an authorization act . . . nor an appropriation act." *Id.*

As the GAO Glossary explains, "direct spending" is also referred to as "mandatory spending," a term matching the permanent appropriation at issue here: "By defining eligibility and setting the benefit or payment rules, Congress controls spending for these programs indirectly rather than directly through appropriations acts." *See id.* at 66. The statutory definitions in 2 U.S.C. § 900 likewise draw the distinction between "discretionary appropriations" and "direct spending." "Discretionary appropriations" is defined as "budgetary resources (except to fund direct-spending programs) provided in appropriation Acts." 2 U.S.C. § 900(c)(7). The CBO's cost estimate for the conference agreement for the ARRA also distinguishes between discretionary spending and direct spending. *See* Letter of Douglas W. Elmendorf, Director, CBO to the Hon. Nancy Pelosi (Feb. 13, 2009).[9] The ARRA's tax-provisions section, which created the BABs program, is listed by the CBO as direct spending.[10] *Id.* at tbl. 1.

---

[9] Congress created the CBO in 1974. Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat 297 (1974). The primary duty and function of the CBO is "to provide to the Committees on the Budget of both Houses information which will assist such committees in the discharge of all matters within their jurisdictions, including . . . information with respect to the budget, appropriation bills, and other bills authorizing or providing new budget authority or tax expenditures . . . ." 2 U.S.C. § 602(a).

[10] As part of the ARRA, the BABs program was created under Division B (Tax, Unemployment, Health, State Fiscal Relief, and Other Provisions), Title I (Tax Provisions), Subtitle F (Infrastructure Financing Tools), Part IV (Build America Bonds). The CBO lists all of Division B as direct spending, explicitly listing refundable tax credits in that category. The CBO's letter is available at https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/costestimate/hr1conference0.pdf.

11

The GAO's *Principles of Federal Appropriations Law* distinguishes between appropriation acts and appropriation-authorization legislation. *See Principles of Federal Appropriations Law*, at 2-54 to 2-82. "Appropriation authorization legislation . . . is legislation that authorizes the appropriation of funds to implement the organic legislation," which is the legislation that "creates an agency, establishes a program, or prescribes a function." *Id.* at 2-54. The authorization may be indefinite, "authorizing 'such sums as may be necessary to carry out the provisions of this act.'" *Id.* 2-56. Section 1324 provides similar language, authorizing an indefinite appropriation: "Necessary amounts are appropriated to the Secretary of the Treasury for refunding internal revenue collections as provided by law . . . ." 31 U.S.C. § 1324(a).

Refundable income tax credits paid to individuals under 31 U.S.C. § 1324 are exempt from sequestration, further indicating that Congress understood that, absent an exemption, the section is subject to sequestration. *See* 2 U.S.C. § 905(d). Because that funding comes from appropriations authorized under section 1324, as does funding for Direct Payment BABs, the exemption undercuts the plaintiffs' argument. If section 1324 were not subject to sequestration as an appropriation act, Congress would have had no need to exempt from sequestration payments of refundable tax credits to individuals. Congress did not provide the same exemption for refundable income tax credits to entities other than individuals, like the plaintiffs. *See id.* In fact, accepting the plaintiffs' arguments would have the effect of adding Direct Payment BABs to the list of programs exempted from sequestration, even though Congress itself had not done so. Rewriting the law as the plaintiffs propose is a task for Congress, not the courts.

The Court finds that 31 U.S.C. § 1324, the statute providing funding for tax refunds to pay the issuers of Direct Payment BABs, is not an "appropriation Act." Instead, the statute authorizes direct spending and, therefore, is subject to sequestration unless Congress exempted the program, which it did not.

### 3.     Overpayment of Taxes or Obligated Funds

The plaintiffs cannot preserve the full 35-percent payment rate for Direct Payment BABs from sequestration by characterizing the payments as an overpayment of taxes or as obligated funds.

The plaintiffs rely on 26 U.S.C. §§ 6401(b)(1) and 6402(a), arguing that these provisions mandate payment to issuers of Direct Payment BABs as an overpayment of tax. (ECF 16 at 10.) Section 6401 is the tax code's general provision defining which amounts are treated as overpayments, and section 6402 provides the IRS the authority to apply an overpayment "against any liability in respect of an internal revenue tax on the part of the person who made the overpayment." 26 U.S.C. §§ 6401(b)(1), 6402(a). Because section 6402 provides the IRS authority *not* to pay a taxpayer, it is irrelevant here. Neither provision defeats sequestration. As discussed, payments to the bond issuers are funded through 31 U.S.C. § 1324, which, at least regarding tax refunds to entities like the plaintiffs, is subject to sequestration.

The plaintiffs also argue that the payments for Direct Payment BABs were exempt from sequestration as obligated funds, citing section 256(*l*) of the Balanced Budget and Emergency Deficit Control Act of 1985. (ECF 16 at 10-11.) That section provides an exemption from

sequestration for "those contracts the reduction of which would violate the legal obligations of the Government." Pub. L. No. 99-177, § 256(*l*)(2)(B). This obligated-funds argument relies on the plaintiffs' claim that they had contracts with the government, an argument the Court rejects below, IV.B. Even worse for the plaintiffs, the section applies only to "contracts in major functional category 050," which relates to national defense spending. *Id.* § 256(*l*)(2); *see also* House Committee on Budget, *Budget Functions*, *available at* https://budget.house.gov/budgets/budget-functions (listing the major budget functions with function number and category). The plaintiffs do not allege to have contracts related to national defense spending, rendering section 256(*l*) irrelevant to their claims.

Apparently uncertain of which concept applies, the plaintiffs in their sur-reply argue that the defendant's "obligation to pay [them] the full 35% of the interest payments for the life of the BABs at issue here easily falls within [the GAO Glossary's] definitions of obligation, obligated balance and unobligated balance." (ECF 23 at 7.) The GAO Glossary provides the following definition of "obligation":

> A definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States.

GAO Glossary 70. An "obligated balance" is "[t]he amount of obligations already incurred for which payment has not yet been made." *Id.* at 71.

As the defendant notes, the government did not obligate funds for the life of the bonds. (*See* ECF 19 at 14 n.3.) Instead, the defendant argues that its obligation arising from the Direct Payment BABs arises not when the bonds are issued, but only after the IRS receives from the bond issuers and processes a timely Form 8038–CP. The government's payment obligation, therefore, does not extend beyond the year processed.

The Court agrees with the defendant. As the GAO explains, under permanent appropriations, such as 31 U.S.C. § 1324, "the money is *available for obligation or expenditure* without further action by Congress." *Principles of Federal Appropriations Law*, at 2-24 (emphasis added). In other words, section 1324 does not obligate the funds for tax refunds but, instead, makes the funds available to be obligated. The ARRA directed the government to pay issuers of Direct Payment BABs "*contemporaneously with each interest payment due under such bond . . .* 35 percent of the interest payable under such bond *on such date*." 26 U.S.C. § 6431(b) (emphasis added). In the budgetary sense in which the GAO definition applies, the funds are not "obligated" until a bond issuer applies for the refund and the IRS determines how much is due to the bond issuer for the given tax year. As the Court elaborates below, the IRS can no longer authorize payment or obligate funds at the original payment rate due to sequestration. *See* 31 U.S.C. § 1341(a)(1)(C) ("Except as specified in this subchapter or any other provision of law, an officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation of funds required to be sequestered under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 . . . .").

13

At oral argument and in their sur-reply, the plaintiffs argue that payments for Direct Payment BABs are exempted from sequestration as "[n]on-defense unobligated balances" under 2 U.S.C. § 905(e). (ECF 23 at 6.) They urge that this exemption is the "current iteration" of § 256 of the Balanced Budget and Emergency Deficit Control Act of 1985. (*Id.*) They again point to the GAO Glossary, which defines "unobligated balance" as "[t]he portion of obligational authority that has not yet been obligated." GAO Glossary 72.

The GAO Glossary entry on "unobligated balance" explains the source of unobligated balances as being from fixed-period appropriations or no-year accounts. *Id.* For fixed-period appropriations, the unobligated balance remains available for five additional fiscal years. *Id.* For no-year accounts, the unobligated balance carries forward indefinitely until either "specifically rescinded by law" or "the head of the agency concerned or the President determines that the purposes for which the appropriation was made have been carried out and disbursements have not been made from the appropriation for 2 consecutive years." *Id.*

As a permanent appropriation, 31 U.S.C. § 1324 is neither a fixed-period appropriation nor a no-year account. First, section 1324 provides a permanent appropriation, so it is not established for a fixed period. Second, although the GAO notes the concepts are similar, it distinguishes between permanent appropriations and no-year appropriations: "In actual usage, the term 'permanent appropriation' tends to be used more in reference to appropriations contained in permanent legislation, such as legislation establishing a revolving fund, while 'no-year appropriation' is used more to describe appropriations found in appropriation acts." *See Principles of Federal Appropriations Law*, at 2-10 n.9. Since section 1324 did not create an obligation that carried over into subsequent fiscal years through a fixed-period or no-year appropriation, the payments to issuers of Direct Payment BABs are not exempt from sequestration as an "unobligated balance." *See* 2 U.S.C. § 905(e) (exempting from sequestration "[u]nobligated balances of budget authority carried over from prior fiscal years").

In sum, the plaintiffs' characterizations of the payments—as overpayment of taxes, obligated funds, or unobligated funds—do not provide a way around the conclusion that payments for Direct Payment BABs are funded through direct spending, subject to sequestration.[11]

---

[11] In paragraph 25 of their amended complaint, the plaintiffs note that section 5 of the ARRA provided that "'[a]ll applicable provisions of this Act are designated as an emergency for purposes of pay-as-you-go principles.'" (ECF 13, ¶ 25 (quoting ARRA § 5(b), 123 Stat. 115, 116).) Pay-as-you-go refers to another type of budgeting enforcement mechanism, not at issue here. *See* H.R. Res. 5, 111th Cong. (2009); *see also* House Committee on Budget, *FAQs on Sequester: An Update for 2020*, *available at* https://budget.house.gov/publications/report/FAQs-on-Sequester-An-Update-for-2020 (explaining the difference between pay-as-you-go, under which sequestration has never occurred, and sequestration under the Budget Control Act). Section 5 of the ARRA has no implication for this case and does not exempt the provision

### 4. Payment for Direct Payment BABs Sequestered

Having found that 31 U.S.C. § 1324 is subject to sequestration, the Court next considers what effect sequestration has on payments to issuers of Direct Payment BABs. Generally, Congress is not bound by earlier legislation; it remains free to modify earlier statutes. *Dorsey v. United States*, 567 U.S. 260, 274 (2012) ("[S]tatutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified."). Congress can modify an earlier statute expressly or by implication as it chooses. *Id.*

Here, the Taxpayer Relief Act, enacted after the ARRA, altered the payment formula for paying issuers of Direct Payment BABs, reducing the government's payment obligation. The Taxpayer Relief Act provided that "[n]*otwithstanding any other provision of law*, the fiscal year 2013 spending reductions required by . . . the Balanced Budget and Emergency Deficit Control Act of 1985 *shall be evaluated and implemented* on March 27, 2013." Taxpayer Relief Act § 901(b), 126 Stat. 2313, 2370 (emphasis added). The Federal Circuit has held that "[t]he introductory phrase '[n]otwithstanding any other provision of law' connotes a legislative intent to displace any other provision of law that is contrary to the Act [containing that phrase] . . . ." *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 364 F.3d 1339, 1347 (Fed. Cir. 2004) *reh'g and reh'g en banc denied*, *cert. denied*, 544 U.S. 973 (2005). As implemented by the Taxpayer Relief Act—notwithstanding any other provision of law—the "[b]udgetary resources sequestered from any account shall be permanently cancelled . . . ." 2 U.S.C. § 906(k)(1). These later expressions of Congress control. The government was statutorily required to reduce its payment obligations.

This court has considered the effect of sequestration on the government's payment obligations in a similar situation involving the Payment in Lieu of Taxes Act ("PILT Act"). *See Kane Cnty. v. United States*, 127 Fed. Cl. 696 (2016). The PILT Act was enacted "to compensate local governments such as counties for the loss of tax revenue stemming from their inability to tax federal lands located within their jurisdictions." *Id.* at 697. In 2008, an amendment made payments mandatory, providing "that local government units '*shall* be entitled to payment,' and that appropriated 'sums *shall* be made . . . for obligation or expenditure.'" *Id.* (quoting 31 U.S.C. § 6906) (emphasis in original). When Congress later passed the Budget Control Act and the Taxpayer Relief Act, it did not include PILT Act payments in the list of programs exempt from sequestration. *Id.*

In *Kane County*, this court held that Congress, by enacting the Taxpayer Relief Act, "diminished funds available to PILT and other spending programs, and altered their funding authority as well." *Id.* at 699. As a judge of this court explained, "by providing that the Budget Control Act 'shall' be implemented 'notwithstanding any other provision of law,' Congress required reductions to the non-exempt PILT program, notwithstanding the 2008 amendments to

---

authorizing the issuance of BABs from sequestration required by the Budget Control Act and the Taxpayer Relief Act.

15

PILT." *Id.* at 698.  The court also noted that sequestered budgetary resources are permanently cancelled under 2 U.S.C. § 906(k)(1).  *Id.*  The Taxpayer Relief Act controlled, and it altered PILT's funding payout regime in 2013, despite the mandatory language in PILT's amendments.  *Id.*

As in *Kane County*, this case presents a conflict between an earlier payment obligation and later sequestration under the Taxpayer Relief Act and the Budget Control Act.  The same reasoning that led the court in *Kane County* to uphold the application of sequestration to the PILT program applies here to the ARRA and produces the same result.

The Taxpayer Relief Act mandated sequestration be implemented "[n]otwithstanding any other provision of law."  Taxpayer Relief Act § 901(b), 126 Stat. 2313, 2370.  As a result of this explicit language, sequestration applies "notwithstanding" the mandatory language in section 1531 of the ARRA.  Those sequestered funds are "permanently cancelled."  2 U.S.C. § 906(k)(1).

The plaintiffs attempt to distinguish *Kane County* by arguing that it did not involve an overpayment of taxes under a statute providing a permanent appropriation.  (ECF 16 at 11-12.)  As already noted, however, because 31 U.S.C. § 1324 is not an "appropriation Act," sequestration applies to refund payments by the IRS for Direct Payment BABs as direct spending.  The factual distinction the plaintiffs advance is without any legal significance.  The later-enacted Taxpayer Relief Act and the Budget Control Act altered the Direct Payment BABs payment program.

The plaintiffs' reliance on cases involving implied repeals is likewise misplaced.  They cite *Maine Community Health* and *Molina Healthcare of California, Inc. v. United States*, 133 Fed. Cl. 14 (2017), both of which were brought under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).  The plaintiffs argue that these cases support their argument that Congress did not impliedly repeal or rescind the government's obligation to pay the plaintiffs 35 percent of the interest on the bonds.  The Supreme Court's opinion in *Maine Community Health* is controlling and provides the authoritative expression of the law on implied repeals, not the earlier decisions in *Molina Healthcare* and other ACA cases from this court.  *See Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436 (2017), *rev'd*, 892 F.3d 1311 (Fed. Cir. 2018), *rev'd and remanded sub nom. Maine Cmty. Health Options*, 140 S. Ct. 1308.

*Maine Community Health* presented a very different legal situation from this case.  *Maine Community Health* involved an alleged implied repeal of the ACA Risk Corridors program.  When Congress appropriated funds for the Centers for Medicare and Medicaid Services, it included a rider prohibiting the use of those funds to make Risk Corridor payments to health insurers.  *Maine Cmty. Health*, 140 S. Ct. at 1317.  In resolving whether a rider on an appropriation act impliedly repealed the statutory payment obligation, the Supreme Court held that it did not because, in part, "a mere failure to appropriate does not repeal or discharge an obligation to pay."  *Id.* at 1324 (citing *United States v. Vulte*, 233 U.S. 509 (1914)).

16

Relevant to the case at hand, the Supreme Court distinguished *Maine Community Health* from a "strand of precedent [that] turned on provisions that reformed statutory payment formulas in ways 'irreconcilable' with the original methods." *Id.* at 1325-26 (citing *United States v. Mitchell*, 109 U.S. 146 (1883) and *United States v. Fisher*, 109 U.S. 143 (1883)). In those cases, subsequent legislation was found to have altered the government's payment obligation.

This case does not implicate an implied-repeal theory or a failure to appropriate funds. The defendant does not (and does not need to) rely on an implied repeal of section 1531 of the ARRA. (*See* ECF 19 at 8-9.) The Taxpayer Relief Act expressly modifies the government's existing payment obligations, and it does so in a way that directly conflicts with the earlier payment program created by section 1531 of the ARRA.

The spending cuts implemented by the Taxpayer Relief Act and the Budget Control Act are irreconcilable with section 1531's 35-percent payment rate. As a result, the Taxpayer Relief Act altered the Direct Payment BABs program, reducing the government's payment obligation. When sequestration was implemented in 2013, the defendant was required by law to pay issuers of BABs a reduced rate. This change was consistent with the basic principle that Congress is free to amend pre-existing laws. *See Dorsey v. United States*, 567 U.S. at 274.

In sum, the defendant's payments to the issuers of Direct Payment BABs were funded through direct spending, which was later sequestered. The sequestration rates expressly altered the payment program, reducing the amount the defendant is obligated to pay. For as long as the funding is sequestered, as it has been since 2013, the defendant does not owe the plaintiffs the 35 percent of the interest originally payable under the bonds. Accordingly, the Court must dismiss the plaintiffs' statutory claim for failure to state a claim upon which relief can be granted.

### B.     Contractual Payment Obligation

The plaintiffs conceded at oral argument that if their statutory claims failed then so would their contract claims because, if the Court found that subsequent legislation altered the defendant's obligations, then there can be no contractual obligation. (ECF 22, Oral Arg. Tr. at 50:9-51:5.) Even if subsequent legislation had not altered the defendant's obligations, the Court nonetheless finds that the plaintiffs have not pleaded a plausible statutory contractual obligation on the government.

To establish a contract with the United States, the plaintiffs must show "(1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) authority on the part of the government agent entering the contract." *Suess v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008). The plaintiffs must also overcome the presumption that statutes do not create contractual rights. *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985). The Supreme Court has held that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Id.* (quoting *Dodge v. Bd. of Educ. of City of Chicago*, 302 U.S. 74, 79 (1937)). Courts "proceed cautiously both in identifying a contract

within the language of a regulatory statute and in defining the contours of any contractual obligation." *Id.* at 466.

"To determine whether a statute gives rise to a contractual obligation, [courts] first look to the language of the statute." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1382 (Fed. Cir. 2019). As the Federal Circuit has noted, "evidence of an intent to contract" has been recognized "where a statute 'provide[s] for the execution of a written contract *on behalf of the United States*' or 'speak[s] of a contract' with the United States." *Id.* at 1381 (quoting *Nat'l R.R. Passenger Corp.*, 470 U.S. at 467 (emphasis in original) (modifications added by the Federal Circuit)).

Here, section 1531 of the ARRA does not frame the payments it authorizes as a contractual obligation. *See* ARRA § 1531, 123 Stat. 115, 358-60. The plaintiffs do not point to any language in section 1531 creating a contract with the government because they cannot. The statute neither provides for the execution of a written contract on behalf of the United States nor reflects any language that could be interpreted to establish a contract between issuers of BABs and the United States. Section 1531 merely sets forth a payment program for issuers of qualifying bonds. This authorization is not enough to establish a contractual obligation. *See Am. Bankers Ass'n*, 932 F.3d at 1383 ("[A] statute does not create contractual obligations merely by setting forth 'benefits to those who comply with its conditions.'" (quoting *Wisconsin & M. Ry. Co. v. Powers*, 191 U.S. 379, 387 (1903))).

Rather than rely on the text of the statute, the plaintiffs rely solely on *Molina Healthcare*, but that case is no help to them. Although *Molina Healthcare* found all four elements of a contract met in the statute for the ACA Risk Corridor program, *Molina Healthcare*'s conclusion on this point has been undermined by later decisions and can no longer support the burden the plaintiffs place on it.

The court in *Molina Healthcare* relied heavily on *Moda Health Plan*, which also found a contract based on the ACA Risk Corridor statute. *See Molina Healthcare*, 133 Fed. Cl. at 41-45. On appeal, and following the decision in *Molina Healthcare*, the Federal Circuit reversed *Moda Health Plan* on this issue: "[N]o statement by the government evinced an intention to form a contract. The statute, its regulations, and [the agency's] conduct all simply worked towards crafting an incentive program." *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311, 1330 (Fed. Cir. 2018), *rev'd on other grounds sub nom. Maine Cmty. Health Options*, 140 S. Ct. 1308. The Federal Circuit recognized "the well-established presumption" from *Nat'l R.R. Passenger Corp.* that a law is not intended to create contractual rights. *See id.* at 1329-30.

Although the Federal Circuit's opinion was in turn reversed by the Supreme Court, the Supreme Court did not reach the contract issue, leaving the Federal Circuit's reasoning intact on the issue. *See Maine Cmty. Health*, 140 S. Ct. at 1331 n.15. In 2019, the Federal Circuit in *American Bankers* adopted the same reasoning and legal basis on the statutory contract issue as it had expressed in its *Moda Health Plan* decision. *Am. Bankers Ass'n*, 932 F.3d at 1380-84. This court's reasoning in *Molina Healthcare* does not express the law of this Circuit. The Federal Circuit's decisions in *Moda Health Plan* and *American Bankers*, decided after this court's decision in *Molina Healthcare*, are the controlling law on the plaintiffs' contract claims.

Both *Moda Health Plan* and *American Bankers* recognized the presumption that statutes do not create contract rights. *Am. Bankers Ass'n*, 932 F.3d at 1381; *Moda Health Plan*, 892 F.3d at 1329. The plaintiffs have not overcome that presumption and cannot establish the requisite mutuality of intent to contract. Specifically, the plaintiffs have not pleaded facts sufficient to establish the defendant's intent to contract.

In *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 28 (2011), for example, this court found that the "plaintiffs [had] not demonstrated an unambiguous offer or the parties' mutual intent to enter a contract . . . ." The court could "not discern and the plaintiffs [had] not pointed to any language in section 1603 [of the ARRA] or its legislative history that would allow a reasonable inference that the government intended to enter into contracts with all persons and entities that filed applications for reimbursement grants." *Id.*; *see also LCM Energy Sols.*, 107 Fed. Cl. at 774 (recognizing that *ARRA Energy Co. I* "expressly rejected the theory that Section 1603 creates an implied-in-fact contract with qualified applicants for reimbursement").

The plaintiffs here likewise cannot point to any language in section 1531 of the ARRA reflecting a "clear indication" that Congress intended to bind the government contractually. *See Nat'l R.R. Passenger Corp.*, 470 U.S. at 465-66; *Am. Bankers Ass'n*, 932 F.3d at 1381-82; *Moda Health Plan*, 892 F.3d at 1329 ("Absent clear indication to the contrary, legislation and regulation cannot establish the government's intent to bind itself in a contract." (citing *Nat'l R.R. Passenger Corp.*, 470 U.S. at 465-66)). The Court does not discern any language that "'speak[s] of a contract' with the United States." *See Am. Bankers Ass'n*, 932 F.3d at 1381 (quoting *Nat'l R.R. Passenger Corp.*, 470 U.S. at 467 (modifications added by the Federal Circuit)). As a result, the plaintiffs have not provided a basis for finding that the defendant intended to contract under the terms of section 1531. The plaintiffs have failed to plead mutuality of intent to contract—the first element of a contract.

Because the plaintiffs have not pleaded facts sufficient to establish the defendant's intent to contract and the statute itself provides no basis on which to demonstrate congressional intent to create a contract by law, the plaintiffs fail to state a plausible claim for breach of contract. The Court must dismiss the plaintiffs' contract claims for failure to state a claim upon which relief can be granted.[12]

---

[12] The plaintiffs clarified in their briefing that they do not assert an implied-in-law contract claim (ECF 16 at 15 n.24), so the Court does not address the issue. The plaintiffs also do not allege a taking of their property. (ECF 22, Oral Arg. Tr. at 37:23-25.)

At oral argument, the plaintiffs' counsel disclaimed any reliance on additional documents constituting a contract, relying on the statutory provisions alone:

> Now, I know Your Honor asked the Government a question about whether or not the BABs issue -- my clients, the Plaintiffs, whether

## V.     CONCLUSION

The plaintiffs' statutory claims and contract claims must be dismissed.  The defendant's obligation to pay 35 percent of the interest payable under the plaintiffs' Direct Payment BABs has been sequestered by subsequent legislation, reducing the defendant's payment obligation.  The plaintiffs also have not pleaded a plausible contractual relationship with the defendant based on the Direct Payment BABs legislation.  The plaintiffs' amended complaint, therefore, fails to state a claim upon which relief can be granted.

The defendant's motion to dismiss under RCFC 12(b)(6) is granted.

The Court will issue an order in accordance with this memorandum opinion.

s/ Richard A. Hertling<br>
<b>Richard A. Hertling</b><br>
<b>Judge</b>

---

> or not they were required to execute a contract type document at the beginning of their efforts to issue bonds, and the Government's answer, to the best of my knowledge, is correct.  No, Your Honor, they were not required to do that.  What we had, instead, was we have a very specific statute which very specifically set forth the offer, if you will, the terms of the contract.

(*Id.* at 50:9-18.)  In their sur-reply following oral argument, perhaps prompted by the Court's questions at oral argument (*see id.* at 18:18-22:21), the plaintiffs for the first time appear to rely on additional documents to try to establish the existence of a contract with the United States.  (ECF 23 at 10-11 (citing *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330 (Fed. Cir. 2021); *Suess*, 535 F.3d 1348; *Hanlin v. United States*, 316 F.3d 1325 (Fed. Cir. 2003)).)  They refer to Forms 8038–CP, CP152, and 8038-G, all of which the plaintiffs allegedly submitted to participate in the Direct Payment BABs program.  (*Id.*)

The plaintiffs have waived any argument based on these additional documents.  *See Casa de Cambio Comdiv S.A. de C.V. v. United States*, 291 F.3d 1356, 1366 (Fed. Cir. 2002) (declining to address the plaintiff's theory "because it was not properly raised" when "[n]o mention of this theory appears in [the plaintiff's] complaint"), *reh'g and reh'g en banc denied* (Fed. Cir. 2002), *cert. denied*, 538 U.S. 921 (2003).  The plaintiffs did not plead a contract based on these documents in their amended complaint, they did not raise this argument in opposition to the defendant's motion to dismiss, and they disclaimed the argument at oral argument.  Nonetheless, even if not waived, the plaintiffs' argument fails.  They have not shown how the forms establish that the government agreed to be bound at the 35-percent rate for the life of the bonds.